UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANIL AGARWAL, | ) | 8:03CV56 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SANDY DALAL, LTD, | ) | |
| | ) | MEMORANDUM OPINION |
| Defendant/ | ) | AND ORDER |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ANIL AGARWAL, | ) | |
| | ) | |
| Counterclaim-Defendant/ | ) | |
| Plaintiff | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RELIANT GLOBAL SERVICES, | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |

Plaintiff, Dr. Anil Agarwal, sued defendant Sandy Dalal, Ltd. (SDL), for breach of contract. SDL asserted several affirmative defenses and filed a counterclaim against Dr. Agarwal and Reliant Global Services, Inc. (Reliant) alleging breach of contract. Both parties waived their right to a jury trial and a bench trial was held.

**FINDINGS OF FACT**

The court finds the following facts have been proven by a preponderance of the evidence:

SDL is a closely-held fashion design company that marketed the designs of Sandy Dalal.  Sandy Dalal's mother, Loma Agashiwala, is the CEO.  Mahesh Agashiwala is an accountant and Sandy Dalal's father.

Sandy Dalal and Arun Agarwal, Dr. Agarwal's son, met while they were students at the University of Pennsylvania in the late 1990s.  In June of 1999, Arun Agarwal and Loma and Mahesh Agashiwala began to discuss an investment in SDL.

The parties signed an "Operating Agreement" dated "6/99."  The agreement provided that "Reliant Global Services, a Nebraska incubator, has assumed responsibility to Sandy Dalal, Ltd. for the payment of accrued expenses up to $1 Million as of December 31, 1999.  The purpose of his [sic] involvement includes marketing, promoting, and coordinating special events for Sandy Dalal, Ltd."  The document was signed by Loma Agashiwala and Dr. Agarwal, for Reliant Global Services.  Def.'s Ex. 138.

Reliant Global Services is a Nebraska corporation.  Reliant actively invested in a number of businesses, including SDL.  Arun Agarwal was involved with Reliant as an asset manager.  Tr. 63.  Arun Agarwal testified that at the time Reliant began its relationship with SDL, the corporation was beginning to focus on "incubating entities," that is, investing in companies at the early stages of development.  Tr. 87-88.  Arun Agarwal testified that the ultimate goal for these investments was that they would "synergize with" other

companies in Reliant's portfolio.  Tr. 87-88.  The primary shareholder in

Reliant was Dr. Agarwal, although there were other investors.  Tr. 114.  When

Arun Agarwal was asked whether other shareholders would have been

consulted regarding Reliant's agreements with SDL, he responded as follows:

> [Counsel for SDL]:  Would there be a member vote to approve this
> arrangement?

> [Arun Agarwal]:  I don't know during the course of Reliant Global
> Services whether we were that formal per se, but we'd certainly
> have meetings and discuss.

Tr. 76.

Negotiations between SDL and Arun and Dr. Agarwal continued after the

operating agreement was signed.  SDL contends that the parties reached a

verbal agreement in the fall of 1999 in which Agarwal would provide $1.5

million in capital to SDL.  See Pl.'s Posttrial Br. at 7.  SDL contends that this

verbal agreement for a $1.5 million equity investment is embodied in the

written agreement in which Reliant assumed responsibility for $1 million

worth of SDL's expenses and a contract in which Dr. Agarwal agreed to

provide an additional $500,000 as a convertible loan.   Loma Agashiwala

testified that the parties discussed a $1.5 million investment, with $500,000

to be invested before the end of 1999.  Tr. 147-149.  Arun Agarwal testified

that between his father and Reliant, they committed a total of $1.5 million to

SDL, which included the $1 million in expenses covered in the operating

agreement and the $500,000 convertible debt agreement.  Tr. 112.

3

On December 28, 1999, Dr. Agarwal entered into a convertible debt agreement with Global Marketing, L.L.C., which is the marketing arm of SDL. Arun Agarwal drafted an agreement under which his father would "place" $500,000 with SDL as convertible debt.  The debt would mature in December of 2002, with an annual interest rate of 8.5 percent.  The agreement gave Dr. Agarwal the option of converting the debt to an equity interest in SDL valued at $5 million.  The parties understood that this meant that if the company was worth $5 million, Dr. Agarwal's investment would be worth 10 percent of the value of the company, or $500,000.  If the company was worth $7 million, the investment would be worth $700,000.

The convertible preferred debt agreement provides:

Sandy Dalal, Ltd. (the "Company") and Anil Agarwal (the investor) agrees [sic] that on or before December 31, 1999, the investor will place $500,000 (Five Hundred Thousand Dollars) as 8.5% Convertible Preferred Debt.

The two parties agree on the following:

1.  The debt is maturing on December 31, 2002, will accrue at 8.5%.  The interest is paid upon maturity at a simple interest rate.
2.  The Company agrees that the money will be converted at a $5MM valuation upon prior to maturity at investor's option.
3.  The Company agrees not to dilute the investor's position without written consent.  Timely consent is needed.
4.  The Company agrees that the debt will remain senior to all other forms of capital investment except to the financial institutions unless authorized in writing by the investor. Timely consent is needed.

4

5.     If Company can pay off the debt earlier, the investor will
       have to decide whether to immediately convert to an equity
       percentage or take money back.

6.     This agreement will be governed by The Laws of The State of
       New York.

Pl.'s Ex. 1.  The agreement was signed by Loma Agashiwala and Dr. Agarwal.

Arun Agarwal's name was crossed out and replaced with Anil Agarwal.  The

change was initialed by Dr. Agarwal and Loma Agashiwala.

On December 28, 1999, Arun Agarwal sent a $500,000 check made

payable to Global Marketing, L.L.C., for the convertible loan.  The check was

drawn on Dr. Agarwal's account.  In a letter accompanying the check, Arun

Agarwal stated "I believe to complete the deal, we will need to produce a non-

recourse, promissory note for the remaining $1MM in deductions (to total

$1.5MM)."  Ex. 220.

Dr. Agarwal had large capital gains from other investments in 1999.  He

was looking for business losses that he could use to offset his capital gains

and reduce his tax liability for 1999.  While negotiating the terms of the

convertible debt, Arun Agarwal and Loma Agashiwala discussed Dr. Agarwal's

need for investment losses in 1999, and whether the $500,000 convertible

debt could be used as such an investment loss.  The check accompanying the

agreement was made payable to Global Marketing, L.L.C., because SDL is a

"C" corporation.  A "C" corporation cannot pass losses to investors.  Arun

Agarwal told Loma Agashiwala that his accountant could pass the loss from

5

an L.L.C. to Dr. Agarwal, thus reducing Dr. Agarwal's capital gains taxes for 1999.

As part of the discussion about the terms of the convertible debt agreement, Arun Agarwal informed Loma Agashiwala that Dr. Agarwal intended to claim a loss on his taxes of approximately $1.5 million for the $500,000 investment.  In a fax to Agashiwala dated December 23, 1999, Arun Agarwal stated "we can discuss the tax arrangements (3:1) tomorrow and conclude this deal."  Ex. 218.  On December 29, 1999, Agashiwala and Dr. Agarwal signed a letter that "confirms Global Marketing, LLC's ability and intent to give deductions for investments made to the Company at a three-to-one ratio.  The intent is to conclude a $500,000 investment with $1.5MM in deductions."  Ex. 32.

On February 24, 2000, Arun Agarwal requested a copy of the operating agreement for Global Marketing, and "any financial information regarding the activity of Global Marketing."  He wanted the information to prepare Dr. Agarwal's 1999 tax return.  See Ex. 146.  On April 18, 2000, Arun Agarwal sent Loma Agashiwala an "open ended Letter of Understanding which will allow the deal to be struck as we have been attempting.  This will allow us to complete taxes upon finding a suitable company to use for deductions."  The

6

letter contained a copy of the Letter of Understanding[1] and Operating Agreement mentioned above, which Loma Agashiwala was supposed to sign. Def.'s Ex. 224.  Loma Agashiwala testified that she did not provide additional financial information because the three-to-one tax deduction did not seem legal.  She did not understand how the $500,000 could be claimed as a bad debt or lost investment, and she did not understand how Dr. Agarwal could claim a loss that was three times the size of the investment.

On May 23, 2000, Arun Agarwal requested "detailed expenses accounting for the $1.468 MM in expenses for 1999 so that we can substantiate the tax returns."  He also indicated that he was meeting with another potential investor.  Upon receipt of the signed operating agreement, letter of understanding, and financial information, Arun Agarwal would discuss the convertible note agreement and a new investment that would occur in 30 to 60 days.  Def.'s Ex. 228.  In another fax dated May 23, 2000, Arun Agarwal stated "[a]fter repeated and failed attempts to close our deal, I am disappointed that this deal is having difficulty closing.  I am making a final request to spend time to close the deal this week otherwise demand for repayment will be made."  Def.'s Ex. 227.

---

[1] Instead of indicating that Reliant was accruing expenses for SDL, this copy had blank spots to be filled in at another time.

7

On June 6, 2000, Arun Agarwal requested invoices and accounts payable to show losses attributed to Dr. Agarwal's involvement with SDL, and stated that upon "receiving that information, I wish to conclude the Preferred Convertible agreement."  Arun Agarwal stated that once that deal was complete, he would aggressively pursue additional financing and that he was close to finding another investor.  Def.'s Ex. 229.

On July 26, 2000, Arun Agarwal made another request for copies of invoices and checks to complete Dr. Agarwal's tax return.  He stated that failure to provide the financial information would "critically hurt the completion of this project and deal."  Def.'s Ex. 232.  On July 27, 2000, Agashiwala stated that she never agreed to give copies of invoices and that "there is no way that I know which will permit you to take deduction [sic] in excess of the investment amount."  Def.'s Ex. 234.  She had previously indicated that she did not want to jeopardize SDL's future, but acknowledged that Arun Agarwal had told her that their accountant knew how to make the deduction and had done it before.  Loma Agashiwala asked Arun Agarwal to "leave it as a 3 year convertible note and not go into the deduction aspect of it."  Pl.'s Ex. 34.

After another series of requests for invoices by Arun Agarwal and a request by Loma Agashiwala for an explanation of how they could make the three-to-one deduction, Dr. Agarwal demanded the return of the $500,000

8

plus interest and expenses on August 22, 2000.  Def.'s Ex. 240.  On

September 8, 2000, Loma Agashiwala provided a summary of SDL's expenses

for 1999, which totaled $1,468,686.  Def.'s Ex. 151 at 3.  Dr. Agarwal claimed

a loss of $1,510,326 on his 1999 individual income tax return from his pass

through investment in Reliant.  See Def.'s Ex. 127 at 35.  He testified that the

expenses accrued by SDL were the basis of this deduction.  Tr. 45.

On February 21, 2001, Arun Agarwal wrote to Loma Agashiwala and

indicated that he wanted a more active role in SDL.  In order to effectively

participate, he wanted audited financial records, copies of sales agreements,

licensing, manufacturing and distribution agreements, and other information.

Pl.'s Ex. 35.  In a letter dated July 23, 2001, to Mahesh Agashiwala, Arun

Agarwal stated that SDL had failed to act in good faith and disclose financial

information that he wanted to ensure that the investment was progressing.

Pl.'s Ex. 39.

Loma Agashiwala testified that after she provided the expense

information in September of 2000, SDL never received additional funds from

Dr. Agarwal or Reliant.  Tr. 160-62.  SDL was unable to obtain sufficient

funding and SDL went out of business.

Acting through his attorney, Thomas C. Underwood, Dr. Agarwal

requested financial information on September 11, 2002, to determine whether

he wanted to exercise his option to convert the debt to an equity position.  Pl.'s

9

Ex. 23.  After receiving no response, Underwood sent a similar letter on
October 14, 2002.  Pl.'s Ex. 31.  Dr. Agarwal did not exercise his option to
convert the debt to equity.  After SDL did not repay the $500,000 loan plus
interest, this lawsuit was filed.

### DISCUSSION

Dr. Agarwal sued SDL for breach of contract to recover the unpaid
$500,000 convertible debt plus interest.  SDL admitted that it did not repay
the loan, but alleged the following affirmative defenses: (1) the instrument was
satisfied; (2) unclean hands; (3) no loan was granted to SDL by Dr. Agarwal;
(4) the convertible debt was part of a larger agreement breached by
Dr. Agarwal; (5) Dr. Agarwal is barred by estoppel from any relief; (6) the
agreement was based on a fraudulent scheme to defraud SDL; and (7)
Dr. Agarwal received the benefit of the bargain.  SDL counterclaimed, alleging
fraudulent inducement and that Dr. Agarwal and Reliant breached the
operating agreement in which Reliant agreed to assume responsibility for up to
$1 million in accrued expenses.

The court has jurisdiction because the parties are diverse and the
amount in controversy exceeds $75,000.  At the outset, the court must
determine which law applies to this dispute.  In diversity cases, federal courts
apply the choice of law rules of the forum state to determine which state's

substantive law applies.  Retail Associates, Inc. v. Macy's East, Inc., 245 F.3d 694, 697 (8th Cir. 2001).

Nebraska follows the Restatement (Second) of Conflict of Laws § 188 (1971).  Mertz v. Pharmacists Mut. Ins. Co., 625 N.W.2d 197, 208 (Neb. 2001). The Second Restatement approach allows parties to contractually agree on applicable law, provided that the choice is "effective."  Restatement (Second) of Conflict of Laws § 188 (2).

In this case, the convertible debt agreement states that it is governed by "The Laws of the State of New York."  Neither party alleges, nor does this court find, that this choice of laws is not effective.  As discussed in detail below, both the convertible debt agreement and the operating agreement must be read as two parts of a larger agreement.  Therefore, the provision found in the convertible debt agreement applies to both agreements, and New York law governs the entirety of the contractual dispute in this case.

## I.    Validity of the Convertible Debt Agreement

To recover for breach of contract, Dr. Agarwal must show that: (1) a valid contract existed; (2) he performed his contractual obligations, (3) SDL breached the contract; and (4) he was damaged by the breach.  Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994) (applying New York law).  To create a binding contract, there must be a manifestation of mutual assent that is sufficiently definite to ensure that the parties agree on

11

the essential terms.  <u>Express Indus. & Terminal Corp. v. New York State Dep't of Transp.</u>, 715 N.E.2d 1050 (N.Y. 1999).  Courts look for the basic elements of offer and acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to an enforceable contract.  <u>Id.</u>

SDL contends that the convertible debt agreement is not a legally binding contract because Reliant is the real party in interest, not Dr. Agarwal, and the document does not indicate that the signers had a "meeting of the minds" as to the essential terms of the agreement.  The document was signed by Dr. Agarwal and the check for the loan came from his account.  Thus, he is the real party in interest.  Loma Agashiwala testified that she understood the terms of the agreement and that it would have to be paid back.  Agashiwala Dep. at 45, Def.'s ex. 243.  The contract contains an offer to loan $500,000 in convertible debt at an 8.5 percent interest rate, due on December 31, 2002, which SDL accepted by having its CEO sign the agreement and accept the $500,000 in cash.  Thus, the court finds that the parties had a meeting of the minds as to the essential terms of the agreement.

SDL also contends that the convertible note agreement was not supported by consideration.  A contract must be supported by consideration in order to be binding.  <u>Weiner v. McGraw-Hill</u>, 443 N.E.2d 441 (N.Y. 1982).  Consideration is either a benefit to the promisor or a detriment to the promisee.  <u>Id.</u>  Pursuant to Fed. R. Civ. P. 8(c), failure of consideration is an

12

affirmative defense that is waived if it is not plead.  SDL did not allege failure

of consideration in its answer.  See Amended Ans. to Amended Compl. and

Counterclaim (Docket 56).  In any event, the $500,000 provided by

Dr. Agarwal is sufficient consideration for the convertible debt agreement,

because it is a benefit to the promisor, SDL.  Accordingly, the court finds that

the convertible debt instrument was supported by consideration, and that it is

a legally binding contract.

The record indicates that Dr. Agarwal performed his end of the bargain

by sending the $500,000 check to SDL.  Dr. Agarwal never exercised his

option to convert the debt to equity.   SDL concedes that it has not repaid the

$500,000 plus interest, but contends that Dr. Agarwal suffered no damages

from the breach because he used the convertible debt instrument to reduce

his tax liability.  The court finds that this is a collateral issue, and that

Dr. Agarwal has suffered damages in the amount of $500,000 plus interest at

an 8.5 percent annual rate.  Thus, the court must consider whether

enforcement of the convertible debt agreement is barred by any of the

affirmative defenses asserted by SDL.

## II.   Affirmative Defenses

### A.   Illegality

In its closing argument, SDL contended that the contract was executed

for an illegal tax deduction, and is therefore unenforceable.  SDL did not

13

assert illegality as an affirmative defense in its answer.  See Amended Ans. to

Amended Compl. and Counterclaim.  As a result, Dr. Agarwal alleges that the

defense has been waived.  Failure to plead the affirmative defense of illegality

usually removes the issue from the case.  See United States v. Krieger, 773 F.

Supp. 580, 582 (S.D.N.Y. 1991); Fed. R. Civ. P. 8(c).  The court may excuse the

failure to plead the defense if the failure did not prejudice the plaintiff.  Id. at

583.  In its counterclaim, SDL alleged that Dr. Agarwal entered into the

agreement to engage in an illegal tax avoidance scheme.  See Amended Ans. to

Amended Compl. and Counterclaim at 7.  Accordingly, Dr. Agarwal was on

notice that the allegedly illegal tax deduction would be an issue in the case.

The issue was also raised repeatedly throughout trial.  Accordingly,

Dr. Agarwal is not prejudiced by the court's consideration of the illegality

issue.  Sabia v. Mattituck Inlet Marina & Shipyard, Inc., 805 N.Y.S.2d 346 (1

Dep't 2005).

        Illegal contracts are generally unenforceable.  Benjamin v. Koeppel, 650

N.E.2d 829 (N.Y. 1995).  The violation of a statute that is merely malum

prohibitum will not necessarily render a contract illegal and unenforceable.

Id. (citing Lloyd Capital Corp. v. Pat Henchar, Inc., 603 N.E.2d 246, 248 (N.Y.

1992)).  "If the statute does not provide expressly that its violation will deprive

the parties of their right to sue on the contract, and the denial of relief is

14

wholly out of proportion to the requirements of public policy, the right to recover will not be denied." Id. (quotation omitted).

Allowing parties to avoid their contractual obligation is especially inappropriate where there are regulatory sanctions and statutory penalties in place to redress violations of the law. Id. The fact that a contract violated federal tax law does not automatically make it unenforceable. Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, 28 F. Supp. 2d 126, 139 (S.D.N.Y. 1998) (citing Murray Walter, Inc. v. Sarkisian Bros., Inc., 486 N.Y.S.2d 396, 399 (3 Dep't 1985). See also Estate of Ellington v. American Soc. of Composers, 2809 N.Y.S.2d 10 (3 Dep't 2006) (no proof of illegal contract designed to evade taxes, but in any event, forfeiture would be disfavored because the illegality was an act malum prohibitum); but see Sabia, 805 N.Y.S. 2d 346 (finding contract unenforceable where plaintiff admitted sales contract was documented in a fictional manner to improperly avoid taxes).

While there is evidence in the record that Dr. Agarwal may have claimed a larger federal income tax deduction than he was entitled to, and may not have been entitled to deduct even one dollar for a loan that had not matured or for expenses that he did not pay, this would not render the convertible loan unenforceable under New York law. See Estate of Ellington, 809 N.Y.S.2d 10. There are penalties available to address violations of the federal tax code.

15

Allowing SDL to keep the $500,000, plus interest at 8.5 percent for over five years is wholly out of proportion to the requirements of public policy.

SDL relies on National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 930 F.2d 240, 243 (2$^d$ Cir. 1991), in which the court held that under New York law, a legitimate contract may be rendered unenforceable by its direct connection to an illegal transaction. This case is inapposite because the contracts were for the delivery of goods in violation of a trade embargo on Iran. See id. The contract could not have been legally performed. Unlike the contract in National Petrochemical, there is nothing illegal about entering into a convertible debt agreement.

**B.    Equitable Estoppel**

SDL contends that Dr. Agarwal is estopped from enforcing the contract. Parties at law or equity are estopped from asserting the contrary of any material fact that he or she has induced another to believe and act on. Holm v. C.M.P. Sheet Metal, Inc., 455 N.Y.S.2d 429 (4 Dep't 1982). "New York's rather restrictive view of estoppel requires three elements on the part of the party estopped: (1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive of the true facts." Id. (citing 21 N.Y. Jur., Estoppel, § 21). The elements pertaining to the party

16

asserting estoppel, commonly known as detrimental reliance, are: (1) lack of knowledge of the true facts; (2) good faith reliance; and (3) a change of position.

SDL contends that it was unaware of Dr. Agarwal's true purpose of entering into the convertible loan agreement and was unaware that Arun Agarwal would not find other investors as he had promised. SDL contends that it relied on the false assurances of Dr. Agarwal and Arun Agarwal that they would find additional investors. SDL contends that relying on these assurances, it stopped seeking additional investors when it executed the convertible note. During trial Loma Agashiwala testified that in 2000, SDL obtained capital (which she referred to as loans and investments) in the amount of $48,677 and $200,000. Thus, SDL's claim that it stopped seeking investors in reliance on the convertible note is not supported by the evidence. The faxes between Loma Agashiwala and Arun Agarwal before the contract was signed indicate that the parties discussed the three-to-one deduction before Loma Agashiwala signed the convertible debt agreement. SDL was therefore aware that Dr. Agarwal intended to use the investment to reduce his tax liability. Accordingly, SDL cannot show detrimental reliance, which is necessary to assert an equitable estoppel defense.

SDL also contends that Dr. Agarwal is estopped from collecting the loan because he claimed the $500,000 loan was an equity investment on his tax

17

returns.  While it is true that Dr. Agarwal represented to the IRS that the
$500,000 was an equity investment and is now alleging that it is an unpaid
debt owed to him, the court is unaware of any authority that would allow the
court to treat the $500,000 as an equity investment based on an estoppel
theory.  Moreover, there is no allegation that SDL relied on his assertion to the
IRS, and the evidence indicates that SDL considers this a debt to be repaid,
not an equity investment in its company.

**C.    Fraud in the Inducement**

SDL contends that Dr. Agarwal knowingly misrepresented his true
purpose in transferring the $500,000 to SDL and falsely promised to provide
up to $1 million in additional financing, which SDL relied on in agreeing to the
convertible debt note.  To prevail on its fraudulent inducement claim, SDL
must show: that Dr. Agarwal knowingly made a false representation as to a
material fact; for the purpose of inducing SDL to rely upon it; that SDL did
rely on it; that the reliance was reasonable; that SDL did not know the
statement was false; and was injured by the reliance.  The Topps Co. v.
Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 265 (S.D.N.Y. 2005) (citing
Computerized Radiological Servs. v. Syntex Corp., 786 F.2d 72, 76 (2d Cir.
1986)); Channel Master Corp. v. Aluminum Limited Sales, Inc., 151 N.E.2d
833 (N.Y. 1958).  A party asserting fraud in the inducement must prove its
claim by clear and convincing evidence.  Mix v. Neff, 473 N.Y.S. 2d 31, 33

18

(3 Dep't 1984).  Parol evidence is admissible in analyzing a fraudulent inducement claim.  <u>Sabo v. Delman</u>, 143 N.E.2d 906 (N.Y. 1957).

As noted above, SDL was aware that Dr. Agarwal intended to claim a loss to offset his capital gains, based on the $500,000 convertible debt note. Thus, SDL cannot show that it was unaware that Dr. Agarwal intended to use the convertible debt agreement to reduce his tax liability.  As to the promise of an additional million dollar investment, there is no evidence in the record that SDL relied on the promise and was injured by the promise.  Furthermore, "New York courts clearly distinguish between a 'promissory statement as to what will be done in the future,' which gives rise only to a breach of contract claim, and a false 'representation of present fact,' which gives rise to a separable claim of fraudulent inducement."  <u>Topps Co.</u>, 380 F. Supp. 2d at 265 (citing <u>Stewart v. Jackson & Nash</u>, 976 F.2d 86, 89 (2d Cir. 1992)).  <u>See also</u> <u>Spellman v. Columbia Manicure Mfg.</u>, 489 N.Y.S.2d 304, 324 (2 Dep't 1985) (failure to fulfill promises to perform acts in the future is breach of contract, not fraud).  Accordingly, the fraudulent inducement claim lacks merit.

**D.    Unclean Hands**

SDL contends that because Dr. Agarwal used the loan to cheat on his taxes and is now attempting to recover the amount due, his attempt to recover damages is barred by the doctrine of unclean hands.  This doctrine generally

applies to equitable proceedings only.  55 N.Y. Jur. 2d Equity § 112.

Moreover, the doctrine of unclean hands "is only available when the conduct

relied on is directly related to the subject matter in litigation and the party

seeking to invoke the doctrine was injured by such conduct." Dinerstein v.

Dinerstein, 300 N.Y.S.2d 677, 678 (1 Dep't 1969) (citing Weiss v. Mayflower

Doughnut Corp., 135 N.E.2d 208, 210 (N.Y. 1956).  SDL was not injured by

Dr. Agarwal's creative accounting methods.  Whether Dr. Agarwal "evaded the

payment of income taxes was and is not the issue in this case.  The revenue

laws, if violated by taxpayers, provide ample punishment and in any event

such evasion would be collateral to the contract between the parties."

Dinerstein at 689.  Accordingly, the unclean hands defense is without merit.

Dr. Agarwal has proven the existence of a valid contract, that he

performed his contractual obligations, that SDL breached the contract and

that he was damaged by the breach.  See Rexnord Holdings, Inc., 21 F.3d at

525.  None of the affirmative defenses that SDL asserted are valid.

Accordingly, SDL must repay the $500,000 at a simple interest rate of

8.5 percent, from December 31, 1999.

**III.   SDL's Counterclaim**

SDL contends that the operating agreement, in which Reliant agreed to

assume responsibility for $1 million in accrued expenses, is either an

enforceable contract or part of a larger agreement that included the $500,000

20

convertible debt instrument.  SDL contends that Reliant breached the contract by failing to assume responsibility for $1 million in accrued expenses.

The operating agreement provides that:

> Reliant Global Services, a Nebraska incubator, has assumed responsibility to Sandy Dalal, Ltd. for the payment of accrued expenses up to $1 Million as of December 31, 1999.  The purpose of his [sic] involvement includes marketing, promoting, and coordinating special events for Sandy Dalal, LTD.

Ex. 138.  The document was signed by Loma Agashiwala and Dr. Agarwal for Reliant Global Services.

Reliant contends that the court may not look outside the four corners of the convertible debt instrument to determine whether the two agreements are part of one contract, or whether the operating agreement is enforceable. When parties sign a clear, complete document, evidence outside the four corners of the document as to what was really intended but unstated is generally inadmissible to add to or vary the writing.  W.W.W. Associates, Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990) (holding that extrinsic evidence was immaterial, in part because the contract plainly manifested intent that all prior understandings were merged into the contract, which expressed the parties' full agreement).

Neither the convertible debt instrument nor the operating agreement contains clear objective language to indicate its status as an agreement intended to stand alone.  Neither agreement contains a merger clause, a

common method of establishing the intent of the parties that a writing is an integration of their agreement. 11 <u>Williston on Contracts</u> § 33:21 (4th ed.). In fact, Reliant argues that the terms of the operating agreement standing alone, a guarantee of "up to $1 million in accrued expenses" without any consideration beyond a potential tax deduction, is "absurd on its face." Reply Brief of Plaintiff/Counterclaim Defendant, at 15. The convertible debt agreement itself is also an exceedingly brief contract, especially considering the magnitude of the transaction, which further supports the argument that it was not intended to stand alone. Under these circumstances the court must consider evidence beyond the four corners of the documents to determine the intent of the parties.

"As a general rule, contracts remain separate unless their history and subject matter show them to be unified . . . The primary standard is the intent manifested, viewed in the surrounding circumstances[.]" <u>Elite Promotional Marketing, Inc. v. Stumacher</u>, 779 N.Y.S.2d 528, 530 (2 Dep't 2004) (internal citations omitted). "Under New York law, all writings forming part of a single transaction are to be read together." <u>This is Me, Inc. v. Taylor</u>, 157 F.3d 139, 143 (2d Cir. 1998). One factor that New York courts have considered in determining whether separate contracts should be read together is whether they are executed simultaneously. <u>Carvel Corp. v. Diversified Mgmt. Group, Inc.</u>, 930 F.2d 228, 233 (2d Cir. 1991); <u>Nau v. Vulcan Rail & Constr. Co.</u>, 36

22

N.E.2d 106 (N.Y. 1941).  Even if contracts are not executed simultaneously, it is still appropriate to construe them together when they are a part of the "same bargain."  Id. ("Even though [the writings] had been made at different dates, that fact would not affect the rule since they were to effectuate the same purpose and formed a part of the same transaction.")  Multiple contracts should be construed together if "the parties assented to all the promises as a whole, so that there would have been no bargain if any promise or set of promises had been stricken."  Williams v. Mobil Oil Corp., 445 N.Y.S.2d 172 (2 Dep't 1981) citing 6 Williston on Contracts, § 863, at 275 (3d ed. 1970); Commander Oil Corp. v. Advance Food Service Equip., 991 F.2d 49, 53 (2$^d$ Cir. 1993).

The convertible debt agreement in this case was executed in the last part of December 1999.  There is some dispute in the record as to when the operating agreement was executed.  Because it is unclear whether the agreements were executed simultaneously, the court must look at whether the two agreements are necessary parts of the "same bargain."  The overall purpose of Dr. Agarwal and Reliant's involvement with SDL is evident.  Dr. Agarwal and Reliant sought to invest in SDL and obtain a return on its investment when the business succeeded.  The convertible debt agreement in theory could prove profitable regardless of the success of SDL.  If SDL were to fail, Reliant could choose not to convert the debt to equity and it would receive an 8.5 percent

23

return.  If SDL was successful, Reliant could exercise the equity option of the convertible debt agreement and it had the potential for a much higher return. In his testimony, Arun Agarwal indicated that Reliant served as an incubator for SDL, looking to grow the company into a successful entity that would be compatible with Reliant.

Significant evidence in the record indicates that the parties considered the convertible debt agreement to be a part of this larger scheme of investment in SDL.  Arun Agarwal testified at trial that his father and Reliant committed a total of $1.5 million to SDL, which included the $1 million in expenses covered in the operating agreement and the $500,000 convertible debt agreement. Loma Agashiwala testified that the investment was going to total $1.5 million. In his letter accompanying the check for the $500,000 loan, Arun Agarwal stated "I believe to complete the deal, we will need to produce a non-recourse, promissory note for the remaining $1MM in deductions (to total $1.5MM)." Def.'s Ex. 220.  Arun Agarwal testified that the non-recourse promissory note referred to the accrued expenses portion of the deal, in which Reliant would assume responsibility for $1 million of SDL's accrued expenses.  Tr. 255-56. This indicates that Arun Agarwal believed that the $500,000 convertible debt agreement and the $1 million operating agreement were part of a larger deal for a $1.5 million investment in SDL.

24

In a request for copies of invoices and checks to complete their tax return, Arun Agarwal and Dr. Agarwal stated that failure to provide the financial information would "critically hurt the completion of this project and deal." When Loma Agashiwala did not provide the invoices, Dr. Agarwal demanded the return of his $500,000 payment plus interest and expenses in August of 2000. This also indicates that he believed that the convertible debt agreement and the accrued expenses agreement were intertwined, because if they were separate, the debt was not due until 2002. On September 8, 2000, Loma Agashiwala provided a summary of SDL's expenses for 1999, which included $1,022,794.60 in expenses paid in 1999, and $445,892 in accrued expenses, for a total of $1,468,686.

Further, the facts of this case indicate that the operating agreement was a part of the overall investment plan by Dr. Agarwal and Reliant. Standing alone, the assumption of accrued debts in exchange only for a tax deduction is "absurd on its face." The operating agreement only makes sense in the context of the general investment scheme. In a writing sent contemporaneously with the $500,000 payment under the debt agreement, Dr. Agarwal and Reliant acknowledged that the payment was only part of the "deal" and further documentation was necessary for the debt assumption. The operating agreement signed by Reliant is consistent with this general investment scheme, as it served to strengthen the financial position of SDL.

25

Plaintiff relies on Schonfeld v. Thompson, 663 N.Y.S.2d 166, 167 (1 Dep't 1997), in which the court held that separate written agreements involving different parties, serving different purposes and not referring to each other were not a unitary contract. The case at bar is distinguishable. Although the two agreements involve different parties (Reliant and Dr. Agarwal), the record indicates that all parties involved treated them as if they were the same entity when negotiating the contract. Throughout the course of dealings with SDL, Arun Agarwal made no distinction between Dr. Agarwal and Reliant. The ability of Dr. Agarwal to obtain tax deductions, both with regard to the convertible debt agreement signed by Dr. Agarwal and the operating agreement signed by Dr. Agarwal on behalf of Reliant, was a constant consideration in all the discussions. The convertible debt agreement was accompanied by a reference to the operating agreement, describing it as a necessary part of the complete "deal." The expense figures required by the operating agreement were submitted to, and accepted by, Dr. Agarwal rather than Reliant. Further, Reliant as a corporate entity is owned in substantial part by the Agarwal family, and therefore its interests are aligned with the interests of the Agarwals. Unlike Schonfeld, the contracts serve the same purpose, making a $1.5 million investment in SDL, with essentially the same entities.

The situation present in this case is more similar to that faced by the court in Commander Oil Corp., 991 F.2d at 53. In Commander Oil, the court

held that it was appropriate to construe together an asset purchase agreement
and a lease, when determining liability between the parties:

> In this case, the Asset Purchase Agreement relates to the
> assets and business that Slater sold to PSI, while the Lease
> involves PSI's rental from Slater of the Glen Cove and Elizabeth
> premises. However, the two transactions were intertwined. They
> were component parts of a single business transaction whereby PSI
> would purchase Slater's business and lease the premises from
> Slater on which to operate it. Each depended on the other; neither
> stood alone.

Id. at 53. The holding of Commander Oil is consistent with the proposition
discussed above that agreements that are part of the "same bargain" should be
construed together.

In this case, both the convertible debt agreement and the operating
agreement are part of the "same bargain," an investment by Dr. Agarwal and
Reliant in SDL. Because both parties acted as if the two agreements were part
of a single contract, and the evidence indicates that they considered the two
agreements to be part of one larger agreement, the court finds that the two
agreements are part of one larger agreement. The terms of the operating
agreement are sufficiently clear to indicate that the parties had a meeting of the
minds as to Reliant's agreement to assume responsibility for up to $1 million in
accrued expenses. Reliant contends that there is no consideration from SDL to
Reliant in exchange for the agreement to assume responsibility for up to
$1 million in expenses. In the context of the larger agreement the assumption
of expenses served to stabilize SDL and allow it to pay off the convertible debt

27

agreement, as well as put SDL in a better position to succeed financially. The financial success of SDL would both make Reliant's position stronger by increasing the potential for synergies with other investments in its portfolio, as well as make Dr. Agarwal's equity option more valuable. The record also indicates that SDL provided financial information which Dr. Agarwal used to reduce his tax liability. Accordingly, the court finds that the operating agreement was legally binding.

Reliant contends that SDL did not comply with the terms of the contract, because it did not submit receipts showing accrued expenses. On September 8, 2000, SDL provided expense information showing $445,892 in accrued expenses, summarized by expenditure category, and listing the check number and amounts. See Def.'s Ex. 151. The contract does not mention a requirement to show receipts. While the summary that Dr. Agarwal obtained could have been more detailed, it was detailed enough for Dr. Agarwal to give up his demand for the return of the $500,000 and was detailed enough for Dr. Agarwal to claim an investment loss on his income tax return. Thus, the court finds that SDL complied with the contract by providing the expense information. Reliant concedes that it did not pay any accrued expenses.

SDL contends it was damaged in the amount of $1 million by Reliant's failure to assume responsibility for the "up to" $1 million in accrued expenses mentioned in the operating agreement. The operating agreement indicates that

28

Reliant agreed to pay up to $1 million of accrued expenses "as of December 31, 1999." In the documentation submitted by SDL, as of the date through which Reliant was obligated, SDL had only accrued debts valued at $445,892. Although SDL argues it suffered damages in the form of lost potential profits, the court finds it far from certain that SDL would have succeeded had Reliant timely paid the accrued debts, and therefore denies any such award as speculative. See Kaufman v. Gordon, 197 N.Y.S.2d 1013 (N.Y. Sup. 1960) (quoting Wakeman v. Wheeler & Wilson Mfg. Co., 4 N.E. 264, 268 (N.Y. 1886)). Because SDL submitted documentation of only $445,892 in accrued expenses, the court finds that it was damaged in the amount of $445,892 by Reliant's breach of its agreement.

SDL fulfilled its contractual obligations on September 8, 2000, when it supplied the accrued expense information to Dr. Agarwal. Prejudgment interest accrues from the date of the breach at an annual rate of 9 percent. City of Binghamton v. Serafini, 778 N.Y.S.2d 547, 549 (3 Dep't 2004) (citing CPLR § 5004). Reliant breached the contract on September 8, 2000, when it failed to pay the accrued expenses that SDL had documented. Accordingly, SDL is entitled to a judgment against Reliant in the amount of $445,892, plus prejudgment interest at an annual rate of 9 percent, as of September 8, 2000.

SDL contends that Dr. Agarwal is personally liable for the damages it suffered from Reliant's breach of contract. "[O]wners are normally not liable for

the debts of the corporation, and. . . it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners." Morris v. New York State Dep't of Taxation & Finance, 623 N.E.2d 1157, 1160 (N.Y. 1993). Because the operating agreement was not entered into by Dr. Agarwal in his personal capacity, the court finds that Dr. Agarwal is not personally liable for the breach of contract damages.  SDL's counterclaim did not allege piercing the corporate veil as a claim; thus the court does not reach this issue at this time.

The court finds that SDL is liable to Dr. Agarwal for breach of contract in the amount of $500,000 plus simple interest at the rate of 8.5 percent, as of December 31, 1999.  The court also finds that Reliant is liable to SDL for breach of contract in the amount of $445,892, plus prejudgment interest at an annual rate of 9 percent, as of September 8, 2000.  Judgment shall be entered accordingly.

Dated September 12, 2006.

BY THE COURT:


/s/ Karen E. Schreier
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

30